# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LAW OFFICES OF PETER MILLER, P.A.,<br>1601 South Broadway Little Rock, AR 72206<br>Individually and on Behalf of All Others<br>Similarly Situated,<br><br>                  Plaintiff,<br><br>   v.<br><br>SINCLAIR BROADCAST GROUP, INC.<br>10706 Beaver Dam Road<br>Hunt Valley, MD 21030<br>Baltimore County;<br><br>TRIBUNE MEDIA COMPANY<br>515 North State Street<br>Chicago, IL 60654;<br><br>TRIBUNE BROADCASTING COMPANY,<br>LLC<br>435 N. Michigan Avenue<br>Chicago, IL 60611;<br><br>and DOES 1-20,<br><br>                  Defendants. | Case No.<br><br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Law Offices of Peter Miller, P.A., individually and on behalf of all others similarly situated, brings this class action for injunctive relief and damages against Defendants Tribune Media Company, Tribune Broadcasting Company, LLC, (collectively, "Tribune") and Sinclair Broadcast Group, Inc. ("Sinclair") (together with Tribune, "Defendants"). Plaintiff alleges, based

upon information and belief[1] except as to the allegations pertaining specifically to Plaintiff that are based on personal knowledge, as follows:

## NATURE OF THE ACTION

1.      This antitrust class action arises from a conspiracy among Defendants and their co-conspirators to fix prices for commercials to be aired on broadcast television stations throughout the United States—in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1—by sharing competitively sensitive information through their advertising sales teams.  Defendants' and their co-conspirators' unlawful collusion led to supracompetitive prices in the market for the sale of television advertising.

2.      Specifically, instead of competing with each other on price for advertising sales as horizontal competitors typically would, Defendants and their co-conspirators shared proprietary information and conspired to fix prices and stifle competition in the market.

3.      Defendants have significant market penetration for advertising in the United States. Sinclair is the largest owner of broadcast television stations in the United States, with 193 stations in approximately 90 cities.  Tribune owns 43 broadcast television stations in approximately 35 cities.  Together, advertising on Defendants' stations reaches *over 80 percent* of all homes in the nation.[2]

---

[1]      Plaintiff's information and belief are based on an investigation (by and through counsel) which included, among other things, a review and analysis of publicly available information, press releases, news articles, and additional analysis.  Counsel's investigation is ongoing.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[2]      Unless otherwise noted, all emphases herein are added and all internal citations are omitted.

4.      Defendants and other broadcast television companies have experienced significant slowing in revenue growth in recent years, due to, *inter alia*, increased competition for advertising dollars from companies like Google and Facebook.

5.      One response to this reduction in revenue growth has been to seek to achieve economies of scale and expand respective customer bases via mergers with and acquisitions of other broadcast television companies.

6.      However, under the National TV Ownership rule adopted by the Federal Communications Commission ("FCC"), Defendants and other broadcast television companies are prohibited from individually owning a group of broadcast television stations that enables them to reach more than 39 percent of all U.S. television households.[3]   Thus, Defendants and other broadcast television companies have faced difficulty with sufficiently increasing revenues solely via mergers and acquisitions.

7.      In fact, Sinclair announced its intention to acquire Tribune over a year ago, but the acquisition appears unlikely to occur due, at least in part, to concerns on the part of the FCC regarding Sinclair's ability to comply with the National TV Ownership rule.

8.      Given this, Defendants and their co-conspirators have responded to decreased advertising spending in another way—by colluding on pricing for television advertising, allowing them to artificially inflate such pricing above competitive levels.

9.      Defendants and their co-conspirators had numerous opportunities to conspire, through industry associations such as the Television Bureau of Advertising, Inc. ("TVB") and the

---

[3]      *FCC Broadcast Ownership Rules*, FCC, https://www.fcc.gov/consumers/guides/fccs-review-broadcast-ownership-rules (last updated Dec. 27, 2017).

National Association of Broadcasters ("NAB"), conferences and meetings held by those associations, and through merger negotiations.

10.     The goal of Defendants' scheme was to charge supracompetitive prices for television advertising.  Given the market share of each Defendant (approximately 40 percent), neither Defendant could have accomplished this goal on its own without risking losing customers. Nevertheless, in a market where Defendants jointly reach *over 80 percent* of U.S. households, Defendants were able to collude to fix, raise, maintain, stabilize, or artificially inflate prices for television advertising with no negative repercussions.

11.     Defendants effectuated their scheme by having members of their advertising sales teams share competitively sensitive information and data with each other, which they used to raise advertising prices to levels higher than they otherwise would have been in the absence of collusion.[4]

12.     On July 26, 2018, *The Wall Street Journal* reported that the United States Department of Justice ("DOJ") was investigating Defendants and unnamed co-conspirators for antitrust violations relating to price-fixing in the market for the sale of television advertising.  The reports indicated that the DOJ uncovered evidence of Defendants' collusive behavior while reviewing the implications of Sinclair's nearly $4 billion proposed acquisition of Tribune.[5]

13.     Several additional media outlets reported the DOJ was investigating whether Defendants and their co-conspirators violated antitrust laws by coordinating "efforts when their ad

---

[4]     *See* Drew FitzGerald and Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, THE WALL STREET JOURNAL (July 26, 2018), https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979?mod=searchresults&page=1&pos=1 (the "Wall Street Journal Article").

[5]     *See id.*

sales teams spoke with one another about performance—conversations that might have led to higher ad rates for TV commercials . . . ."[6]

14.     Plaintiff and members of the Class are direct purchasers of television advertising from one or more Defendants or their co-conspirators within the United States.  Specifically, Plaintiff purchased television advertising from Sinclair.

15.     From at least 2016 forward (the "Class Period"), Defendants' conduct proximately and foreseeably caused Plaintiff and members of the Class to suffer injuries by stifling competition and inflating, fixing, raising, stabilizing, or maintaining prices for television advertising in the United States, which were higher than prices that would have been established in a competitive market.

16.     The impact of Defendants' unlawful and anticompetitive conduct is ongoing and continues to this day, and requires injunctive relief to prevent future harm to Plaintiff and members of the Class.

17.     Until the publication of reports regarding the DOJ investigation on July 26, 2018, Defendants fraudulently concealed their unlawful conduct from Plaintiff and members of the Class, and Plaintiff and members of the Class had no way of knowing the advertising rates they were paying were the result of unlawful collusion.

18.     Plaintiff and members of the Class seek injunctive relief and damages for their injuries caused by Defendants' collusive, manipulative, and anticompetitive restraint of competition in the market for television advertising in the United States.  Specifically, Plaintiff seeks injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees on behalf of

---

[6]     Dawn C. Chmielewski, *Justice Department Investigating Local TV Station Owners Over Ad Sales – Report*, DEADLINE (July 26, 2018), https://deadline.com/2018/07/justice-department-investigating-local-tv-station-owners-ad-sales-report-1202434431/ (the "Deadline Article").

itself and the Class of direct purchasers, as defined herein, pursuant to Section 1 of the Sherman

Antitrust Act, 15 U.S.C. § 1.

**JURISDICTION AND VENUE**

19.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Section

16 of the Clayton Act, 15 U.S.C. § 26, to award equitable and injunctive relief for violations of

Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Court also has jurisdiction pursuant to 28 U.S.C.

§§ 1331 and 1337(a) to award damages for violations of Section 1 of the Sherman Act, 15 U.S.C.

§ 1.

20.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act,

15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants are believed

to have resided, transacted business, were found, or had agents in the District, a substantial part of

the events giving rise to the claims occurred within this District, and a substantial portion of the

affected interstate trade and commerce discussed herein has been carried out in this District.

Additionally, Defendant Sinclair is headquartered in this District, in Hunt Valley, Maryland.

21.     This Court has personal jurisdiction over each Defendant because each Defendant

is believed to have transacted business throughout the United States, including in this District; had

substantial contacts with the United States, including in this District; and/or committed overt acts

in furtherance of their illegal scheme and conspiracy in the United States, including in this District.

In addition, Defendants' conspiracy was directed at, and had the intended effect of causing injury

to persons residing in, located in, or doing business in the United States, including in this District,

and Plaintiff's claims arise out of Defendants' conduct.

22.     Defendants' activities were within the flow of, were intended to, and did have a

substantial effect on the interstate commerce of the United States.

## THE PARTIES

### Plaintiff

23.     Plaintiff Law Offices of Peter Miller, P.A., is a law firm located in Little Rock, Arkansas and is a direct purchaser of television advertising from Sinclair. Plaintiff has purchased television advertising from Sinclair throughout the Class Period. As a result of Defendants' and their co-conspirators' collusive and anticompetitive conduct, Plaintiff has paid artificially inflated prices for television advertising and has been injured in its business or property.

### Defendants

24.     Defendant Sinclair Broadcast Group, Inc., a Maryland corporation headquartered in Hunt Valley, Maryland, is a diversified television broadcasting company.

25.     Defendant Tribune Media Company, a Delaware corporation headquartered in Chicago, Illinois, is a diversified media and entertainment business.

26.     Defendant Tribune Broadcasting Company, LLC, a Delaware limited liability company headquartered in Chicago, Illinois, is a television broadcasting company that operates as a subsidiary of Tribune Media Company.

27.     Plaintiff alleges on information and belief that Does 1-20, inclusive, were co-conspirators with Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof. Does 1-20 are other television broadcast companies and their predecessors, successors, subsidiaries, corporate officers, members of the boards of directors, or senior officials, or predecessors, successors, subsidiaries, corporate officers, members of the boards of directors, or senior officials of Defendants. Plaintiff is presently unaware of the true names and identities of those defendants sued herein as Does 1-20. Plaintiff will amend this Complaint to allege the true names of the Doe defendants when it is able to ascertain them.

7

**Co-Conspirators and Agents**

28.     Various persons and/or firms not named as defendants herein have participated as

co-conspirators in the violations alleged herein and have performed acts and made statements in

furtherance thereof.  Defendants are jointly and severally liable for the acts of their co-conspirators

whether named or not named as defendants in this Complaint.

29.     Each Defendant and their respective subsidiaries acted as the principal of or agent

for the other Defendants with respect to the acts, violations, and common course of conduct alleged

herein.

## FACTUAL ALLEGATIONS

## I.     Changing Trends in the Television Broadcasting Industry

30.     In recent years, television broadcasting companies have experienced significant

slowing of growth in their advertising revenues.[7]

31.     Facing increased competition from internet and other advertising, the following

chart depicts the slowing growth of television advertising spending in the United States since 2012.

Notably, the chart depicts a trend of decreased advertising spending beginning in 2016 and predicts

that such spending will continue to decrease over the next few years:[8]

---

[7]     *See* Gavin Mann, Francesco Venturini, and Ekta Malhotra, *The Future of Broadcasting V*, ACCENTURE (2016), https://www.accenture.com/t20170411T172611Z__w__/us-en/_acnmedia/ Accenture/next-gen/pulse-of-media/pdf/Accenture_Future_of_Broadcast_V_POV.pdf.

[8]     *TV advertising spending in the United States from 2011 to 2020 (in billion U.S. dollars)*, STATISTA, https://www.statista.com/statistics/272404/tv-advertising-spending-in-the-us/ (last visited July 27, 2018).



32.     As shown above, TV advertising spending stalled in 2016 and began to decline thereafter.  In response to reduced spending, Defendants conspired to artificially inflate advertising prices in order to stabilize and grow revenues.

33.     Indeed, despite decreased television advertising spending, Sinclair and Tribune have grown or substantially maintained revenue to above 2015 levels since 2016, as shown below:



34.     Defendants also increased net income during 2016 and 2017.  Tribune generated a loss of $319,918,000 for fiscal year 2015, but generated net income of $14,246,000, and $194,119,000 for 2016 and 2017, respectively.[9]  Sinclair's net income results for 2015, 2016, and 2017 were $171,524,000, $245,301,000, and $576,013,000, respectively.[10]

35.     Also in response to decreased ad spending, television broadcasting companies have been forced to attempt to grow their customer bases through mergers and acquisitions to achieve economies of scale to remain profitable, thereby increasing market concentration.[11]

---

[9]     Tribune Media Co., Annual Report (Form 10-K) (Mar. 1, 2018).

[10]    Sinclair Broad. Grp. Inc., Annual Report (Form 10-K) (Mar. 1, 2018).

[11]    *See* Mann et al., *supra* note 7.

36.     Defendants are no strangers to this phenomenon, as they began discussing a potential merger years ago and publicly announced their plans in May 2017.[12]  The maps below depict the number of broadcast television stations Sinclair would own before and after the acquisition under the original plan submitted to regulators, and the vast number of U.S. television households Sinclair and Tribune would jointly reach (nearly three quarters of American homes in the original merger plan).[13]



37.     Wary of FCC rejection of the deal, Defendants submitted a revised version of the merger plan to antitrust regulators, whereby Sinclair would acquire Tribune for $3.9 billion, forming a company that would own 215 broadcast television stations in 102 cities, reaching close to 60 percent of all U.S. television households.[14]

---

[12]     *See* Mike Snider, *$4 billion TV deal creates nation's largest broadcaster*, USA TODAY (May 7, 2017), https://www.usatoday.com/story/money/business/2017/05/07/sinclair-broadcasting-buy-tribune-media-4-billion-deal-reports-say/101409222/ (the "USA TODAY Article").

[13]     Alvin Chang, *Sinclair's takeover of local news, in one striking map*, Vox (Apr. 6, 2018), https://www.vox.com/2018/4/6/17202824/sinclair-tribune-map.

[14]     *See* Ted Johnson, *What's Next for the Other Big Merger: Sinclair-Tribune*, VARIETY (June 25, 2018), https://variety.com/2018/politics/news/sinclair-tribune-merger-fcc-2-1202855551/.

38.     Defendants jointly have extreme market penetration, with Tribune currently reaching 43% of the nation's households and Sinclair reaching 38% of American homes.[15]

39.     Indeed, analysts called the proposed merger between Sinclair and Tribune, "a very transformative acquisition" that would create "a broadcaster with as close to a national footprint as you can get."[16]  Sinclair's CEO, Chris Ripley, echoed this belief, stating the combined company would reach "72% of U.S. homes across 108 markets including 39 of the top 50" and "[t]his combination creates the largest TV broadcasting company in the country."[17]

40.     The revised merger plan could only be accomplished by selling certain television stations to reduce the number of households jointly reached by Tribune and Sinclair (which currently is over 80 percent).  However, Sinclair's revised plan called for selling certain stations to friends and other parties with whom it has a business relationship, for significantly less than fair value, raising questions about whether Sinclair would actually continue to control these stations.[18]

41.     Sinclair is not the only television broadcasting company to seek economies of scale by expanding customer bases through acquiring additional television stations.  Indeed, the market for the sale of television advertising is highly concentrated.

42.     As Defendants have learned, however, the FCC's National TV Ownership rule, which prohibits a single television broadcasting company from owning a collection of stations

---

[15]     *See* USA TODAY Article.

[16]     *Id.*

[17]     *Id.*

[18]     *See* Hamza Shaban, *Why Sinclair's latest plan to sell major TV stations has critics crying foul*, THE WASHINGTON POST (Mar. 14, 2018), https://www.washingtonpost.com/news/the-switch/wp/2018/03/14/why-sinclairs-latest-plan-to-sell-major-tv-stations-has-critics-crying-foul/?utm_term=.b4dab9adc46b (the "Washington Post Article").

such that it reaches more than 39 percent of all U.S. television households, makes mergers and acquisitions on the scale necessary to achieve improved profitability very difficult.[19]

43.　　Indeed, the FCC recently stated that it has "serious concerns" and "material questions"[20] about the merger between Sinclair and Tribune, and referred the matter to an administrative law judge for review, which typically sounds the "death knell" for mergers.[21]

44.　　Specifically, the FCC is concerned that Sinclair did not intend to actually relinquish control over television stations that it proposed to divest in order to comply with the National TV Ownership rule, and that Sinclair was less than candid with the FCC.[22]  Indeed, the FCC suspected certain "'sidecar agreements' [ ] would allow Sinclair to retain control of stations without owning them."[23]  According to FCC Commissioner Michael O'Rielly, the vote to send the merger to an administrative law judge is a "'de facto merger death sentence.'"[24]

45.　　Yet, even without an approved merger, Defendants' conspiracy allowed them to jointly control advertisers' ability to reach more than 80 percent of U.S. households and to use this control to stifle competition.  From at least 2016 forward, Defendants used their combined reach

---

[19]　　*Id.*

[20]　　Deadline Article.

[21]　　John Eggerton, *Report: DOJ Looking at TV Ad Sales*, BROADCASTING & CABLE (July 26, 2018), https://www.broadcastingcable.com/news/report-doj-looking-at-tv-ad-sales.

[22]　　*See* Tony Romm and Brian Fung, *Trump criticizes FCC for moving to block Sinclair-Tribune merger*, THE WASHINGTON POST (July 25, 2018), https://www.washingtonpost.com/technology/2018/07/25/trump-criticizes-fcc-moving-block-sinclair-tribune-merger/?utm_term=.631f332ce201; David Zurawik, *Trump calls FCC action against Sinclair 'sad, unfair, disgraceful,'* THE BALTIMORE SUN (July 24, 2018), http://www.baltimoresun.com/entertainment/tv/z-on-tv-blog/bs-fe-zontv-sinclair-trump-fcc-20180724-story.html.

[23]　　*See* Deadline Article.

[24]　　*Id.*

to conspire to charge supracompetitive prices for television advertising in violation of federal antitrust laws.

## II.    Defendants and Their Co-Conspirators Colluded to Fix Television Advertising Prices

46.    Faced with the reality that they would not be able to maintain and increase their profits through mergers and acquisitions alone and staring down increasing competition for advertising dollars from digital platforms like Facebook and Google, which remain crucial to broadcast television owners' financial success, Defendants and their co-conspirators sought to increase profits by raising television advertising prices through price-fixing.[25]

47.    In furtherance of this conspiracy, advertising sales representatives of the Defendants and their co-conspirators shared competitively sensitive information and data that allowed the companies to fix, raise, maintain, stabilize, and/or artificially inflate pricing for television advertising.[26]

48.    Defendants and their co-conspirators not only had the motive to collude on television advertising prices, as described above, but they also had numerous opportunities to conspire to achieve their combined goal—charging artificially inflated prices for television advertising without the risk of losing customers.

49.    Defendants and their executives participate in numerous industry associations that provide the opportunity to share competitively sensitive information and conspire to effectuate their scheme.

---

[25]    *See* Wall Street Journal Article.

[26]    *See id.*

50.     For example, the TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry."  TVB is designed to bring together and encourage information sharing among employees of broadcast television companies like Defendants, especially advertising sales representatives.  TVB is especially dedicated to helping broadcast television companies promote and improve their advertising sales efforts.[27]

51.     Sinclair and Tribune, among other media companies, are members of TVB.  TVB events and initiatives provided Defendants with the opportunity to collude and to act in furtherance of their conspiracy.

52.     To this end, on November 20, 2017, a group of broadcast television companies, including Sinclair and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners."[28]

53.     Sinclair and Tribune, among others, had been working together to launch this initiative since early 2017, which provided them additional opportunity to share competitively sensitive information related to advertising sales and pricing.[29]

54.     Sinclair's President and CEO, Chris Ripley, was quoted as stating that Sinclair and the other broadcast television companies, including Tribune, had a "shared commitment to

---

[27]     *See About TVB*, https://www.tvb.org/AboutTVB.aspx (last visited July 27, 2018).

[28]     *Local Television Broadcasters' TIP (TV Interface Practices) Initiative to Accelerate Electronic Workflow for TV Advertising Transactions,* BUSINESS WIRE (Nov. 20, 2017), https://www.businesswire.com/news/home/20171120005141/en/Local-Television-Broadcasters%E2%80%99-TIP-TV-Interface-Practices.

[29]     *See id.*

***working together***" to promote and grow their advertising sales and corresponding revenues and profits.[30]

55.     Similarly, Tribune's President and CEO, Larry Wert, stated that the broadcast television companies, including Sinclair and Tribune, were "***actively working together***" to promote "the continued growth of our respective businesses."[31]

56.     In other words, Sinclair, Tribune, and their co-conspirators openly worked together to develop information systems that would provide standardized data and forms that could be used to sell television advertising to potential advertisers and, in the process, shared information with each other, which was used to engage in unlawful price-fixing.

57.     Sinclair, Tribune, and other broadcast television companies are also members of the NAB, which describes itself as the "premier trade association for broadcasters."[32]   Sinclair's CEO, Chris Ripley, and Tribune's COO, Kathy Clements, both serve on the NAB Television Board of Directors.[33]   Representatives of Sinclair, Tribune, and other broadcast television companies also serve together on the NAB Television Technology Committee.[34]   NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

---

[30]     *See id.*

[31]     *See id.*

[32]     *About Us*, https://www.nab.org/about/default.asp (last visited July 27, 2018).

[33]     *See NAB Board of Directors*, https://www.nab.org/about/nabBoard.asp (last visited July 27, 2018).

[34]     *See              2018              NAB              Committees*, https://www.nab.org/documents/about/2018NABCommittees.pdf (last visited July 27, 2018).

58.     Sinclair's attempt to acquire Tribune, which has been ongoing for years (and was publicly announced in May 2017), provided an additional opportunity for the companies to collude to artificially inflate prices for television advertising.

### III.     The Television Advertising Market Was Ripe for Collusion

59.     The market for television advertising was particularly susceptible to collusion during the Class Period because: (1) there are a limited number of television station owners selling television advertising; (2) the barriers to entry are extremely high; (3) the products are homogenous; (4) Defendants and their co-conspirators have a common motive to conspire—a desire to maintain and increase their profits; and (5) Defendants had ample opportunities to conspire with each other through industry associations and initiatives such as NAB, TVB and the TIP Initiative.

60.     Defendants colluded with each other by sharing competitively sensitive information regarding advertising sales and pricing to artificially inflate prices for television advertising.  Defendants engaged in the anticompetitive conduct described herein in order to charge supracompetitive prices without the risk of losing customers.

61.     In a conspiracy that increases the price for consumers, market forces would typically attract new entrants seeking to exploit the pricing gap created by that conspiracy's supra-competitive pricing. But where, as here, there are high barriers to entry for an industry, new broadcast television companies outside the conspiracy are less likely to enter the market.

62.     In the broadcast television industry, there are high barriers to entry due to high capital costs and a high degree of technical sophistication and relative scarcity of people with experience in those areas.  As discussed above, television broadcasting companies have discovered

that they can only survive and thrive by growing ever larger, making it almost impossible for a new entrant to the market to effectively compete with Defendants.

## IV.     The DOJ Launches a Probe into Defendants' Collusion in the Television Advertising Market

63.     As reported by *The Wall Street Journal* on July 26, 2018, the DOJ has launched an investigation into Defendants' and their co-conspirators' collusion in the market for the sale of television advertising in the United States.[35]

64.     While conducting a review of the nearly $4 billion acquisition proposed by Sinclair and Tribune, the government discovered information that led it to investigate Defendants' conspiracy to artificially inflate advertising prices.[36]  Specifically, the DOJ is investigating whether Defendants "coordinated efforts when their ad sales teams communicated with each other about their performance" in order to artificially inflate television advertising prices in violation of federal antitrust laws.[37]

65.     The Deputy Assistant Attorney General for Civil Antitrust, Barry Nigro, recently acknowledged that antitrust investigations often arise during the course of merger reviews.[38]  Mr. Nigro further noted that potential antitrust violations sometimes come to the DOJ's attention through document analyses performed in connection with such reviews.[39]

---

[35]     *See* Wall Street Journal Article.

[36]     *Id.*

[37]     *Id.*

[38]     *See* Leah Nylen, *Number of no-poach agreements uncovered by DOJ 'shocking,' official says*, MLEX MARKET INSIGHT (May 17, 2018), https://mlexmarketinsight.com/insights-center/editors-picks/antitrust/north-america/number-of-no-poach-agreements-uncovered-by-doj-shocking,-official-says.

[39]     *See id.*

66.     Indeed, when conducting a merger investigation pursuant to the Hart-Scott-Rodino Antitrust Improvements Act, the DOJ or the Federal Trade Commission ("FTC") may issue "broad 'second requests' for documents and data" that "may reveal antitrust problems separate from the reported merger."[40]  This is the case here.[41]

## THE RELEVANT MARKET

67.     Plaintiff disclaims the need to plead a relevant market for its antitrust claims because the price-fixing conspiracy alleged herein is a *per se* violation of the Sherman Act, 15 U.S.C. § 1.  The restraint of trade and anticompetitive conduct alleged herein directly inflated or maintained prices and restrained competition in the market for the sale of television advertising in the United States, constituting a *per se* violation of the Sherman Act, 15 U.S.C. § 1.

68.     In the alternative, Defendants' collusion is an unreasonable restraint of trade, which resulted in substantial anticompetitive effects in the market for the sale of television advertising in the United States in violation of the Sherman Act, 15 U.S.C. § 1 under a "quick look" or "rule of reason" mode of analysis.

69.     The relevant product and geographic market for purposes of this complaint is the market for the sale of television advertising in the United States.

## ANTITRUST INJURY

70.     Plaintiff and members of the Class are direct purchasers of television advertising from one or more Defendants or their co-conspirators in the United States.

---

[40]     *See DoJ Employee "No-Poach" Antitrust Consent Decree Sharpens Compliance Teeth*, JDSUPRA (April 30, 2018), https://www.jdsupra.com/legalnews/doj-employee-no-poach-antitrust-consent-38009/.

[41]     *See* Wall Street Journal Article.

71.     Sinclair and Tribune are horizontal competitors in the market for the sale of television advertising in the United States.  Together, the media companies reach more than 80% of households in the United States.

72.     Defendants and their co-conspirators participated as co-conspirators and performed acts in furtherance of the conspiracy alleged herein.

73.     Defendants intended to restrain trade, and actually restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1,  by engaging in artificial manipulation of the U.S. market for the sale of television advertising—including price-fixing—and their conduct injured competition and Plaintiff and members of the Class.

74.     Defendants and their co-conspirators shared a conscious commitment to the common scheme designed to achieve the unlawful objective of inflating, fixing, stabilizing, and/or maintaining advertising rates.

75.     Rather than competing on price as horizontal competitors typically would, Defendants colluded to artificially inflate, stabilize, fix, and/or maintain prices for television advertising, thereby increasing advertising prices relative to the but-for world in which Defendants competed on price.

76.     As alleged herein, Defendants' collusion had the following effects on the U.S. market for the sale of television advertising and proximately caused injury to Plaintiff and members of the Class in the following ways, *inter alia*:

a.     Defendants' unlawful anticompetitive conduct restrained price competition in the market for the sale of television advertising in the United States;

b.     Purchasers of television advertising from one or more Defendants or their co-conspirators in the United States—including Plaintiff and members of the Class—

paid fixed, maintained, stabilized, and/or artificially inflated prices for television advertising that were above competitive levels; and

c.   Purchasers of television advertising from one or more Defendants or their co-conspirators in the United States—including Plaintiff and members of the Class—have been deprived of the benefit of free and open competition on the basis of price in the market for the sale of television advertising.

77.   Absent Defendants' and their co-conspirators' collusion, those purchasing television advertising would have transacted at competitive prices and reaped the benefits of competition.

78.   As a direct, intended, foreseeable, and proximate result of Defendants' unlawful conspiracy and acts in furtherance of their conspiracy, Plaintiff and members of the Class have been injured in their business and property, in violation of the federal antitrust laws.

79.   The injury to Plaintiff and members of the Class is the type the antitrust laws were designed to prevent and directly flows from Defendants' unlawful anticompetitive conduct.

80.   There is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade.

81.   Defendants are jointly and severally liable for the acts of their co-conspirators.

## EFFECT ON INTERSTATE COMMERCE

82.   Billions of dollars of transactions in television advertisements are entered into each year in interstate commerce in the United States.

83.   Defendants' manipulation of the market for the sale of television advertising had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

84.     Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

85.     Defendants' unlawful conduct has a direct and adverse impact on competition in the United States. Absent Defendants' combination, conspiracy, and/or agreement to manipulate the market for the sale of television advertising, the prices of television advertising would be determined by a competitive, efficient market.

## FRAUDULENT CONCEALMENT AND TOLLING OF THE STATUTE OF LIMITATIONS

86.     Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the conspiracy and conduct alleged herein.  Through no fault or lack of diligence, Plaintiff and members of the Class were deceived and had no knowledge regarding Defendants' collusion to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising and could not reasonably discover the collusion.

87.     The very nature of Defendants' conspiracy was secret and self-concealing. Defendants engaged in market manipulation that could not be detected by Plaintiff and members of the Class.

88.     Plaintiff and members of the Class had no facts sufficient to place them on inquiry notice of the conspiracy alleged herein until July 26, 2018, when *The Wall Street Journal* published an article reporting that the DOJ was investigating collusion between Defendants and their co-conspirators to inflate prices in the market for the sale of television advertising.[42]

---

[42]     *See* Wall Street Journal Article.

89.     As alleged herein, Defendants' collusion to fix prices in the market for the sale of television advertising was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statute of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable diligence that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising, which Defendants fraudulently concealed.

90.     Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants and their co-conspirators were colluding to fix, maintain, stabilize, and/or artificially inflate prices for television advertising.

91.      Defendants knowingly, actively, and affirmatively concealed the facts alleged herein, including their collusion to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising.

92.     Plaintiff and Class members reasonably relied on Defendants' knowing, active, and affirmative concealment.

93.     For these reasons, all applicable statutes of limitations have been tolled based on the discovery rule and Defendants' fraudulent concealment and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

94.     Plaintiff brings this proposed action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and 23(b)(2), and/or (b)(3) on behalf of itself and as a class action, seeking injunctive relief and damages on behalf of the following nationwide class of those similarly situated:

All persons, corporations, and other legal entities that purchased television advertising from one or more Defendants or their co-conspirators in the United States from 2016 forward (the "Class").

95.     Excluded from the Class are Defendants and their parents, subsidiaries, and corporate affiliates, officers, directors, employees, assigns, successors, and co-conspirators, the court, court staff, Defendants' counsel, and all respective immediate family members of the excluded entities described above.  Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserves the right to add Sub-Classes where appropriate.

96.     The Class is so numerous that individual joinder of all potential members is impracticable.  Plaintiff believes that there are at least thousands of proposed members of the Class throughout the United States.

97.     Common questions of law and fact exist as to all members of the Class and predominate over any issues solely affecting individual members of the Class.  The common and predominating questions of law and fact include, but are not limited to:

a.      Whether Defendants' conduct is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

b.      Whether Defendants unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.      Whether Defendants engaged in a price-fixing conspiracy among horizontal competitors in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

d.      Whether Defendants engaged in a combination, conspiracy, and/or agreement to stifle competition in the market for the sale of television advertising in the United States;

e.      Whether Defendants engaged in a combination, conspiracy, and/or agreement to raise, fix, maintain, stabilize, and/or inflate prices in the market for the sale of television advertising in the United States;

f.      The identity of the participants in the conspiracy;

g.      The duration of the conspiracy;

h.      The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

i.      Whether the conduct of the Defendants, as alleged herein, caused injury to the business or property of Plaintiff and members of the Class;

j.      Whether the conduct of the Defendants, as alleged herein, reduced price competition in the market for the sale of television advertising in the United States and caused television advertising to be sold at artificially inflated prices;

k.      Whether Plaintiff and other members of the Class are entitled to injunctive relief and, if so, the nature and extent of such relief;

l.      Whether equitable relief should be awarded; and

m.      Whether actual damages, costs, disgorgement, and/or treble damages should be awarded.

98.     Plaintiff's claims are typical of the claims of other members of the Class because Plaintiff and all members of the Class share the same injury.  As alleged herein, Plaintiff and members of the Class sustained damages arising out of the same illegal actions and conduct by Defendants.

99.     Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the

interests of the Class and has no interests adverse to or in conflict with the interests of the other members of the Class.

100.    Plaintiff's interests are co-extensive with and are not antagonistic to those of absent Class members.  Plaintiff will undertake to represent and protect the interests of absent Class members and will vigorously prosecute this action.

101.    Plaintiff has engaged the services of the undersigned counsel.  Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and absent Class members.

102.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

103.    Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to Class members predominate over any questions affecting only individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

104.    The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Class.

105.    The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical.  The Class has a high degree of similarity and is cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

## COUNT I
## VIOLATIONS OF SECTION 1 OF
## THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1

106.    Plaintiff incorporates by reference and re-alleges each preceding paragraph as though fully set forth herein.

107.    As alleged herein, Defendants combined, conspired, and agreed to stifle competition in the market for the sale of television advertising in the United States.  Specifically, Defendants and their co-conspirators colluded to fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising.

108.    Defendants' and their co-conspirators' price-fixing conspiracy alleged herein is a *per se* violation of the Sherman Act, 15 U.S.C. § 1.  The restraint of trade and anticompetitive conduct alleged herein directly inflated or maintained prices and restrained competition in the market for the sale of television advertising in the United States, constituting a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

109.    Defendants' combination, conspiracy, and/or agreement unreasonably restrained trade in violation of the federal antitrust laws.

110.    Alternatively, the anticompetitive combination, conspiracy, and/or agreement alleged herein resulted in substantial anticompetitive effects in the market for wireless communication services in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

111.    Defendants intended to restrain trade and actually restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants shared a conscious commitment to the common scheme designed to achieve the unlawful objective of fixing, maintaining, stabilizing,

and/or artificially inflating television advertising prices and stifling competition in the market for the sale of television advertising.

112.    The anticompetitive combination, conspiracy, and/or agreement alleged herein unreasonably restrained trade, and there is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade.    Any alleged procompetitive benefit or business justification is pretextual and/or could have been achieved through less restrictive means.

113.    The anticompetitive combination, conspiracy, and/or agreement alleged herein occurred within the flow of and substantially affected interstate commerce.

114.    As a direct and proximate result of Defendants' anticompetitive scheme and concrete acts in furtherance of that scheme, Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

115.    Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

116.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C.  § 15, Plaintiff and Class members are entitled to treble damages, costs, and attorneys' fees for the violations of the Sherman Act alleged herein.

## COUNT II
### INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1

117.    Plaintiff incorporates by reference and re-alleges each preceding paragraph as though fully set forth herein.

118.     Plaintiff asserts this count on behalf of itself and the members of the nationwide Class.

119.     As alleged herein, Defendants and their co-conspirators combined, conspired, and agreed to stifle competition and fix, maintain, stabilize, and/or artificially inflate prices in the market for the sale of television advertising in the United States.  This combination, conspiracy, and/or agreement unreasonably restrained trade in violation of the federal antitrust laws.

120.     Specifically, the anticompetitive combination, conspiracy, and/or agreement alleged herein is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Alternatively, the anticompetitive combination, conspiracy, and/or agreement alleged herein resulted in substantial anticompetitive effects in the market for the sale of television advertising in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

121.     Defendants intended to restrain trade and actually restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants shared a conscious commitment to the common scheme designed to achieve the unlawful objective of fixing, maintaining, stabilizing and/or artificially inflating television advertising prices and stifling competition in the market for the sale of television advertising.

122.     The anticompetitive combination, conspiracy, and/or agreement alleged herein unreasonably restrained trade, and there is no legitimate business justification for, or procompetitive benefits of, Defendants' unreasonable restraint of trade.   Any alleged procompetitive benefit or business justification is pretextual and/or could have been achieved through less restrictive means.

123.     The anticompetitive combination, conspiracy, and/or agreement alleged herein occurred within the flow of and substantially affected interstate commerce.

124.     As a direct and proximate result of Defendants' anticompetitive scheme and concrete acts in furtherance of that scheme, Plaintiff and members of the Class have been injured and will continue to be injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and are entitled to injunctive relief, costs, and attorneys' fees pursuant to the Clayton Act, 15 U.S.C. § 26.

125.     Unless enjoined, Defendants' anticompetitive combination, conspiracy, and/or agreement will continue.

126.     Plaintiff's and the Class members' injuries are of the type the antitrust laws were designed to prevent and are a direct result of Defendants' unlawful anticompetitive conduct.

127.     Plaintiff and members of the Class seek an injunction against Defendants, preventing and restraining the Sherman Act violations alleged herein, costs, and attorneys' fees. *See* 15 U.S.C. § 26.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

a.      certify this lawsuit as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

b.      declare Defendants' conduct alleged herein violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.      permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees and other officers, directors, agents and employees thereof, and all other

persons acting or claiming to act on their behalf, from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

d.      find Defendants jointly and severally liable for the acts of their co-conspirators and for the damages incurred by Plaintiff and the Class;

e.      award actual damages, costs, disgorgement, and/or treble damages under applicable law;

f.      award Plaintiff and members of the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15 (a);

g.      require Defendants to pay both pre- and post-judgment interest on any amounts awarded;

h.      award Plaintiff costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

i.      direct any such further relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 27, 2018

/s/ Asher Alavi
Asher Alavi
Joseph H. Meltzer (*pro hac vice* forthcoming)
Kimberly A. Justice (*pro hac vice* forthcoming)

Melissa L. Troutner (*pro hac vice* forthcoming)
Christopher A. Reese (*pro hac vice* forthcoming)
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA  19087
Tel: (610) 667-7706
Fax: (610) 667-7056
Email: aalavi@ktmc.com
      jmeltzer@ktmc.com
      kjustice@ktmc.com
      mtroutner@ktmc.com
      creese@ktmc.com

*Attorneys for Plaintiff Law Offices of Peter Miller*
*P.A. and the proposed Class*

John C. Goodson (*pro hac vice* forthcoming)
Matt Keil (*pro hac vice* forthcoming)
**KEIL & GOODSON P.A.**
406 Walnut Street
Texarkana, Arkansas 71854
Tel: (870) 772-4113
Fax: (870) 773-2967
      jgoodson@kglawfirm.com
      mkeil@kglawfirm.com

James E. Cecchi (*pro hac vice* forthcoming)
**CARELLA, BYRNE, CECCHI, OLSTEIN,**
**BRODY & AGNELLO, P.C.**
Caroline F. Bartlett
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
      jcecchi@carellabyrne.com

*Additional Counsel for Plaintiff Law Offices of*
*Peter Miller P.A. and the proposed Class*